Good morning, Your Honor. It's Elizabeth Farris, Federal Defenders, on behalf of Mr. Flores-Villar. This appeal raised several issues, and my intent today is to focus primarily on or completely on the first issue, specifically whether the statutory scheme violates the Equal Protection Clause by discriminating on the basis of gender. And that was the issue that was the subject of the district court's written and published decision in the case. The statutory scheme at issue here violates the Equal Protection Clause of the Constitution because it discriminates on the basis of gender. Specifically, it precludes unmarried men under the age of 19 from conferring citizenship on their children born abroad, while allowing women, unmarried women of child – of any childbearing age to transmit citizenship to their children. Because the statutory scheme discriminates on the basis of gender, the government has the burden of – I'm not sure I understand how you get to first base on that argument in light of the Supreme Court's decision in Nguyen and our second decision after the Supreme Court reversed us in Ahumada Aguilar. Well, in Nguyen, the – Nguyen considered very different provisions of the statutory scheme that confers citizenship on children born abroad. And in Nguyen, the Supreme Court did apply intermediate scrutiny. Although it didn't decide that that standard was necessarily applicable, the Supreme Court assumed that it was and decided that under – under intermediate scrutiny. And – But assuming – assuming that intermediate scrutiny applies here, why is the government's interest not the same and not substantially related to it the same as in Nguyen? Well, in Nguyen, the provisions dealt with ensuring that there was a relationship between the child and the father. It was ensuring that there was a biological relationship, a caretaking relationship, that the person or the putative father actually was a father. The – the discriminatory provision here has – isn't – Well, but just because this guy turns out to be a good guy and stepped up to the plate. I mean, factually. I mean, factually. Right. But – We're talking about whether the statute has an impermissible classification requiring fathers to have been present in this country for five years after their age of 14. Right. But that provision has nothing to do with ensuring that there is a caretaking relationship between the father and the child. It really has no bearing on the relationship between the father and child. So what was that issue in Miller and Nguyen? Well, it's a combination. What they said in Nguyen is the first reason was the one in the Fats Waller song, one never know, do one. And the second reason was that there's a great – much greater likelihood of some real relationship. I believe in the – one of the cases on this that might have been my dissent in the first Ahumada Agawar talked about that Congress also had a concern that there'd be a whole lot more people if they were looking at the children of all the G.I.s who were on R&R during the Vietnam War. And I think that that's actually a very good point because I think it – it demonstrates why the government's interest in why there isn't a significant problem with statelessness for the children of unmarried mothers in comparison to the children of unmarried fathers. Because when you're reviewing under intermediate – when you apply intermediate scrutiny, the government must show both an important governmental interest and that the means employed are directly and substantially related to that interest. Well, statelessness, the government does have an important interest in preventing statelessness. But when you're reviewing under intermediate scrutiny, it has to be both the actual purpose and the gender benefited. In this case, women must be at a disadvantage in relation to that classification. In other words, there actually – there has to be – women must be at greater risk of having stateless children, or there must be more stateless children born to the unmarried parent – unmarried mother. But it isn't just statelessness of the children that's the reason. There are a whole lot of reasons. And Congress has plenary power in the area. Well, the reason that the district court found in this case – I mean, it's possible that all Congress is thinking of is, oh, the poor children, they're stateless. What a terrible thing. We must make sure these children have some nationality. But that doesn't have to be the only thing Congress is thinking of. Well, there's no evidence that that was what Congress was actually thinking when it enacted the discriminatory provisions. It doesn't have to be, does it? And if you're reviewing for intermediate scrutiny as the Supreme Court did in Wynne, it does have to be the Supreme Court in Mrs. Wynne. Why? Why do they have to think about the children at all? Why can't they just think about the women abroad who had sex with an American when he was over there and the children coming in, as opposed to the welfare of the children? Just think about whether the U.S. wants to exclude them. Well, I think that in order to – I mean, that's Congress. They can do what they want. Well, in order to draw a gender-based line or that Congress does have to, there has to be some empirical evidence that it's a problem and some evidence that it was Congress's actual purpose. And here, there really isn't any evidence that it was Congress's actual purpose. Do you think you need empirical evidence that GIs have sex with women they aren't married to when they're abroad? Well, that actually supports our argument that the problem of statelessness is not greater for women, for United States unmarried U.S. citizen women, but rather that it's more likely that the problem is greater with respect to unmarried fathers abroad. What problem? The problem Congress is trying to solve is keeping people out, as far as I can tell. You're referring to some different problem, and I'm not sure what it is. Well, I don't think that the problem is keeping people out, and there's no – that wasn't what the difference was. Congress has a big rigmarole you have to go through to get into the United States unless you're a citizen. Right. And the question – I mean, I think if you look at the history, and it's worth noting that from 1790 until 1934, and in fact until the Nationality Act of 1940, men were permitted to transmit citizenship to their children so long as they had resided in the United States at some point. It wasn't until the Nationality Act – in 1934, that was extended to women with the same requirement that they resided at some point in the United States. It wasn't until the Nationality Act of 1940 that there were these greater residency requirements. I wonder what else happened around 1940. Well, that wasn't what was – whether Congress has an interest in keeping people out, there still has to be a sufficiently – an exceedingly persuasive justification for discriminating along the basis of gender when doing that, and there isn't in this case. Well, I think the reason the Supreme Court, of course, as we would have to too if we put it in print, put it more delicately, was a whole lot of women and their children could they have no idea whether they're children of American GIs or they know that they weren't. But that's not the provision that we're attacking. That was the provision that was at issue in Miller and Winn, and the provision that we're attacking is one that's much broader, and it doesn't – it affects the children of United States citizen fathers who have already legitimated their children. So – But doesn't the five-year residence aspect further an interest in having children born abroad have a shot at connection with the United States? Because if the father has been here for five years after he's old enough to kind of appreciate what the country is about, the likelihood of his illegitimate child born abroad having a connection and having some sense of what this place is about is greater. And why isn't that an important interest that served? Well, I don't – I think that we're asking the wrong question, because that – that – I don't dispute that that would be an important interest. But the question is what's – What's wrong about the question? The problem is that it doesn't recognize the gender line that is being drawn here. So if it's such an important interest, then why impose it only on men and not on women? Because that doesn't have – that residency requirement has nothing to do with the different position of men and women. Well, men are differently situated biologically. And that's why Congress required the – imposed the legitimation requirement. But that's not what – that's not the provision that is being attacked here. And I – we would agree that Congress can – If it's the mother who – well, all right. If it's the – these arguments have all been gone through Nguyen. That's why I think where Judge Kleinfeld started is kind of where we come back to. I mean, any one of us might accept or reject any one of the points that were made in Miller and Nguyen, but those are the points that have been made. And I can't understand why they don't apply just squarely to this section as well as to the ones under consideration. Well, the Supreme Court actually specifically noted that it wasn't deciding the constitutionality of the residency requirement. So why is the reasoning any different? Because the interest in – the interest in ensuring that there – that the person actually is the father, that there actually is a relationship between the parent and child, is one that was served by those provisions. That interest is not served by the – by the residency requirements. So the interest – the different playing fields, so to speak, that men and women are at at the time of the child's birth were served, and the Court found that they are served by the – by the legitimation requirements. But once the father establishes that relationship with his child and is – does take on the responsibilities as a father and establishes that caretaking relationship, he should be treated the same as a mother in that same situation. And I think the Supreme Court said as much in the Kaban v. Muhammad case that – that maternal and paternal – paternal roles, once there is that caretaking relationship established, once the father steps up to the plate, are no different. And this law, the 10-5 requirement, so to speak, doesn't address that. Okay. And so what I did want to – want to go through a little bit is the actual legislative history, because I think that it's somewhat – it does expose the true motivation here, which – or what was motivating the more lenient residency requirements, and that they really are based on stereotypes about who will raise, nurture, and be responsible for a child that is born out of wedlock and not about preventing statelessness, which was what the justification asserted by the government. If you look at the 1939 report, for example, that was submitted by President Roosevelt and accompanied the proposed legislation, it explained with regard to the provision regarding conferral of citizenship on the children of unmarried mothers that under such a child as against the putative father and is bound to maintain it as its natural guardian. And the report quotes another source for the principle that the mother, as guardian by nurture, has the right to the custody and control of her bastard child. And that was what accompanied the proposed legislation. And we know under the way that equal protection principles have developed since then and the Supreme Court's jurisprudence, for example, in the Caban case, that that's not true, that you can't assume that the mother is going to be the nurturing parent, that a father, when he does legitimate his child and attempt to take on a caretaking role, that there is not a fundamental difference between the maternal and the paternal roles. They're not invariably different in importance, as the Supreme Court noted. And so I think what this the residency requirements really, unlike the legitimation requirements that were addressed in Miller and Wynn, really are based on these stereotypes or the byproduct of traditional ways of thinking about the roles of women and men. And the government cited a 1952 Senate report, and I just wanted to make this very clear, and I'm going to be led by it at first, because the government cites it for the proposition that it was the reason for the residency requirements. And that was actually taken out of context. The 1952 report that the Senate report that said that the elimination of or that the provision would ensure that a child have a nationality did not refer to the lenient residency requirements, but rather the elimination of a requirement that the child or that a child born to an unmarried mother would not obtain citizenship if legitimated by the father. And so I just wanted to make that clear because I had myself misread that until I went back and looked at the actual report. So under a Supreme Court jurisprudence, to comply with the Constitution, as I noted, the gender benefited by a gender classification must actually suffer a disadvantage. And I don't think that there really is any evidence that women suffer a disadvantage in this regard, or at least the children born abroad suffer a disadvantage. As the government asserted in Huachope v. United States State Department, the default rule was that citizenship followed the father, not the mother. So if only, as the special rule for children born out of wedlock, children of United States citizen fathers, whether legitimate or illegitimate, would be at risk of being stateless and choose sanguine nations or nations that follow the rule that citizenship followed by descent, whether so. And as Judge Kleinfeld mentioned in referring to his dissent, there were far more men abroad, men, United States citizen fathers, that have children abroad, as opposed to women, that I think, Your Honor, referred to in your dissent as it being negligible. So you understand I would not have referred to my dissent except that the Supreme Court bought it? Well, but that was with respect to different provisions that had different justifications and a basis in the different positions between men and women, who gives birth and that sort of thing. And so the residency requirements really are not tied to the caretaking role or to the relationship between the father or the parent and the child. So even in the 29 or 30 countries where there was a special rule for children born out of wedlock, as the government notes on page 18 of its brief, in most cases, the mother, that was subject to taking the father's citizenship if actually legitimated. So there would still be a huge problem with respect to statelessness for United States citizen fathers if they legitimated. I think that there's some other evidence that I see that my time is running out.   Do you want to save it? I will get it. Thank you. Mr. Hall. Good morning, and may it please the Court. I'm William Hall for the Appellate of the United States in this matter. I think Judge Klinko hit on something that's very important here. Actually, I was sitting listening to the appellant's argument. It reminded me of something my old torts professor used to say. He's one of the most used to work in Delhi and New York City, and he would always say, the most important questions about law is how thinly you slice the bologna. And I think what we have here is, as Judge Klinko pointed out, we have a rather complex scheme about how derivative citizenship can be passed along, and that there are a variety of different things animating that statutory scheme. And pretty much almost every element of it has been litigated time and again in the courts. I mean, historically, Rogers v. Belli, approving of the residency requirements generally, that they're appropriate, run at least Schultz, which I actually think is a very important case, where this argument that the appellant now makes and run at this court, albeit from a rational basis review as opposed to an intermediate scrutiny review, basically agreed with the government that statelessness was a valid reason and a legitimate reason to distinguish between unmarried and married mothers with regards to the residency requirements. And I don't see any reason, any difference substantively between that situation and this one here. It's the exact same interest that is animating it. And when I go back to slicing the bologna, kind of the point of our brief was to basically say, even if you slice the bologna as narrowly as the appellant wants, which is to get to precisely this discrepancy picked out between unmarried men and unmarried women, it still satisfies the requirements of whatever level of review this Court deems appropriate. But I don't think we have, as Judge Kleinfeld and Judge Reimer, you seem to suggest, I don't think we even have to go there. Because this isn't this very thin slice of bologna. It's a larger statutory scheme that has a variety of different things animating behind it. And I don't want to belabor the point too much about the government's interest in preventing statelessness here, but it's very important. And the unmarried woman who had, unmarried United States citizen as a child abroad is of, basically you have four different types of individuals that the derivative citizenship laws could be applying to. You could have a married United States citizen, father, a married United States citizen, mother, an unmarried United States citizen, father, and an unmarried United States citizen, mother. Only the United States, unmarried United States citizen, mother, is likely, as Congress found and this Court found and run it, is going to be in the position to potentially have a stateless child. And Congress decided to make a bit of a carve-out from its general five-year residency requirement to deal with that precise situation. Otherwise, because of the way that United States laws about citizenship conflicted with the ones prevailing around the rest of the world, it took that into account and said, to avoid that problem with regard, we'll make it a little bit more lenient on unmarried mothers who, I think it's fair to say, if we're talking about gender discrimination, the idea that unmarried mothers have been a group that has generally been the subject of favorable legislation and treatment under the law, I think, is a minimum of stretch. But they're the one group that was going to benefit from it. And Congress specifically made that carve-out in Section 1409 for that purpose. It's — this Court's already found it's a legitimate government interest. I don't think that — I think it's very clear it's an important government interest as well if this Court indeed does deem that intermediate scrutiny is appropriate and also substantially related to that interest. It's the only reason for the difference. If the distinction were animated by some sort of animus or some sort of stereotype, Congress wouldn't have made a distinction between married and unmarried women who — from whom people were trying to derive citizenship. The only possible reason why Congress could have set up that distinction was there was something particular, not about the gender, but about the unmarried status of the mother. And that's exactly right. Because in countries where you have bloodline citizenship as opposed to birthright citizenship as we have here, if the father doesn't legitimate the child, the father doesn't pass the citizenship. If the mother is not a citizen of, say, Germany, she doesn't pass the citizenship. All of a sudden, that's a stateless child. Congress wanted to prevent that. I mean, I think you can make an argument that would pass strict scrutiny. You know, on intermediate scrutiny or rational basis analysis. So I don't want to belabor the point too much. And I'm happy and able to answer any questions that the panel has on this specific issue, but I'm otherwise prepared to submit on my briefing. I think we're fine. Thank you very much. The government mentioned a few times that Congress decided that this – that statelessness was a problem, and that in their briefs that women were deemed – were in a different situation than men, and so different rules were deemed appropriate. But as I noted when reviewing their brief, that proposition actually has no citation. And there is no citation to that. There's nothing that the government has pointed to that shows that this was something that was discussed and considered by Congress, whether women were at greater risk of being stateless than men, or the children of women, unmarried mothers, were at greater risk than men. And there really is no evidence that unmarried mothers were at greater risk. The government notes, for example, that – I thought the law was that, at least if it's rational basis analysis, all we have to do is speculate. And if we can come up with some reasonable basis for distinction, then we have to assume that Congress had a reasonable basis. Well, I think that if you apply rational basis, that we would disagree on that. First, I would – I know you think intermediate basis. But I think if you look at Huachope v. U.S. State Department, in that case, the Ninth that really existed up until – But that was before Miller, and it was before Nguyen. Right. And that's why they applied only rational basis review. But even applying rational basis review, this Court found that that – that the statelessness, dual nationality problem could not have been the justification for the legislation because – even at that time in history, most countries around the world followed the Jus soli principle, or that a child would be a citizen in the place of birth. So that this purported problem of statelessness and dual nationality really couldn't have been the justification for the statute. With respect to whether there is a substantial relation, I would just note that even if women were at some greater risk, which there's been no findings of, of having stateless children, the difference is not substantial enough to justify the magnitude of the discrimination in this case. In comparison to Craig v. Boren, for example, where there was a difference between Oklahoma for good-to-sale beer or near beer to men under 21 and women under 18, there was actually some empirical evidence that supported the different age requirements for women and men. Two percent of males in the age group were arrested for drunk driving in comparison to only 0.18 percent of females. Yet the Supreme Court found that this significant statistical difference was insufficient. I think it said specifically that it hardly conformed the basis for employment of a gender line as a classifying device. Ms. Rocha, thank you. I think your time has expired. I appreciate the argument from both of you. Thank you. The matter just argued to be submitted, and the Court will stand and request.
judges: Hall, Rymer, Kleinfeld